## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James H. Campbell,

               Plaintiff,

v.

Michael J. Astrue,
Commissioner of Social Security,

               Defendant.

File No. 12-cv-336 (DWF/TNL)

**REPORT &**
**RECOMMENDATION**

Edward C. Olson, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401, for Plaintiff; and

David W. Fuller, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 for Defendant.

## I. INTRODUCTION

      This matter is before the Court, United States Magistrate Judge Tony N. Leung, on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (Docket No. 8) and Defendant's Motion for Summary Judgment (Docket No. 13). These motions have been referred to the undersigned magistrate judge for a report and recommendation to the district court, the Honorable Donovan W. Frank, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and Local Rule 72.2(b).

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 8) be **GRANTED** and this matter be **REMANDED** for further proceedings and Defendant's Motion for Summary Judgment (Docket No. 13) be **DENIED**.

## II. BACKGROUND[1]

Plaintiff James H. Campbell brings the present case, contesting Defendant Commissioner of Social Security's determination that Plaintiff was no longer disabled as of January 1, 2009.

### A. Procedural History

Plaintiff applied for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. §§ 1381-85, on July 20, 2006. (Tr. 123-24.) Plaintiff asserts that he has been disabled since April 30, 2006, due to mental-health issues, including depression, delusional disorder, and adjustment disorder. (Tr. 33, 45.) Plaintiff's applications were both denied on September 22, 2006, and upon reconsideration on January 23, 2008. (Tr. 123-24, 166, 169.) Plaintiff subsequently appealed the reconsideration determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 174, 177.)

---

[1] Plaintiff listed high blood pressure as a physical impairment when applying for benefits. (*See* T. 303.) The ALJ concluded that Plaintiff does not have any severe physical impairments, including high blood pressure. (T. 17; *see also* T. 478, 512.) Plaintiff does not challenge the ALJ's determination concerning the presence of any severe physical impairments. (*See, e.g.*, T. 477; Pl.'s Memo. at 4 (Docket No. 8).)

### 1. First Determination by ALJ

A hearing was held by ALJ Roger Thomas on December 16, 2009. (Tr. 29, 132.) Plaintiff appeared along with his fiancée and then-counsel Frank W. Levin. (Tr. 31, 43, 132.)

Plaintiff testified that, around 2000, he had been referred to a rental property, where the property manager was also a minister. (T. 47, 48.) Plaintiff moved into an apartment on the property and, at some point, the minister came to Plaintiff with a job proposition to work as a caretaker for the property. (T. 47, 48.) Plaintiff accepted and soon discovered drug activity going on inside the property. (T. 46, 47, 48.) Plaintiff reported the activity to the minister, who then told the tenants about Plaintiff's complaints. (T. 48.) From then on, Plaintiff felt he was being harassed by the entire building. (T. 48, 51.) Plaintiff testified that he had guns pulled on him and was beaten. (T. 49, 50.) Plaintiff testified that he was forced to bring "civil rights charges" against the minister and, "once [he] brought [the minister] up on civil rights charges[, Plaintiff] started experienc[ing] retaliation and intimidation in non-stop form." (T. 49.) Plaintiff also testified:

> And I've never, ever experienced this and I've lived in
> several states, I'm [sic] never experienced this type of
> Posttraumatic Stress brought on by institutional racism, which
> has brought on by psychological techniques which were
> brought on by people who work[] for entities, agencies and
> businesses who stuck up to the place as they are called to do.

(T. 54.)

Plaintiff stated that he has nightmares about what happened and is constantly worried about who is going to bother him next. (T. 49.) Plaintiff explained that "it's like

you're living in another world." (T. 50.) When asked about how these thoughts interfere with his ability to read and accomplish things around the house, Plaintiff testified that they have "a lot to do with it." (T. 50.) Plaintiff also testified that "every day" he spends "time thinking about and reliving these experiences." (T. 50.)

When asked about his mental-health issues, Plaintiff explained that they interrupt his concentration and focus and he is "not as sharp as [he] used to be." (T. 45.) Plaintiff also stated that he has difficulties reading and comprehending the things he has read. (T.45.)

On February 12, 2010, the ALJ concluded that Plaintiff has not been under a disability since April 30, 2006. (Tr. 132, 139.) Among other things, the ALJ found and concluded that Plaintiff has the severe impairments of post-traumatic stress disorder ("PTSD"), adjustment disorder with anxiety and depression, and "questionable" delusional disorder, and these impairments, when considered individually or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 134-35.)

## 2. Remand of Appeals Council

Plaintiff sought review of the ALJ's February 12 decision with the Appeals Council. (Tr. 146.) On December 17, 2010, the Appeals Council vacated the February 12 decision and remanded this case for resolution of the following issue:

> The decision finds the claimant retains the following residual functional capacity [("RFC")]: simple, routine, repetitive instructions and tasks in unskilled work, and brief, infrequent and superficial contact with co-workers and the public (Decision, Finding 5). The decision also states that the

> claimant could perform his past relevant work as a grocery worker and janitor (Decision, Finding 7). However, the claimant's testimony suggests these positions are inconsistent with the assessed [RFC] . . . ."

(Tr. 147.) The Appeals Council concluded that the duties of a grocery worker were not provided through the work-history portion of the application process or through Plaintiff's testimony at the hearing. In addition, the record lacked information concerning when Plaintiff held this position or his earnings. (Tr. 147.) The Appeals Council also noted that Plaintiff had testified that his previous janitorial position was in a supervisory capacity, which is categorized as skilled labor. (Tr. 147.)

On remand, the Appeals Council directed the ALJ to reevaluate Plaintiff's past relevant work and "issue a new decision." (Tr. 148.)

### 3. Second Determination by ALJ

ALJ Thomas held a second hearing on March 25, 2011. (T. 12.) Levin again appeared on behalf of Plaintiff. (T. 67.)

### a. Plaintiff's Testimony

At the hearing, Plaintiff testified that he has been out of work for approximately ten years due to his PTSD. (T. 79.) Referring back to the harassment by the minister, Plaintiff testified:

> Well, I'm going to put it to you like this, Judge. I brought up a[n] evangelical Lutheran minister up on civil rights charges, I got harassed, I got everything that you possibly can think of in the psychological technique that was put on me I had that happen to me.
>
> . . . .

And I'm still to this day going through the same situation.

. . . .

2003, police officers, UPS drivers, FedEx drivers, mail clerks, hospital employees, you name it they all was on the team.

. . . .

I believe Dr. King called it the psychological technique of the north.

. . . .

When you go up against a powerful entity in the north this is what happens to you, you get retaliated, harassed and abused and you know and I know, Judge, it's going on right now here in this town and in this city because that's the problem they're having at the Civil Rights Department and the disparity rate that just came out Wednesday the 23rd it's proof and evidence and I'm living damn proof of it.

(T. 82-83.)  Plaintiff testified that he feels like he is still being harassed, trailed or followed, and kept under surveillance.  (T. 86, 116.)  Plaintiff testified that he thinks about the harassment every day, all day, and that it sometimes interferes with his ability to read, complete household tasks, and watch a movie.  (T. 116.)

Plaintiff testified that he had seen a psychologist in the past, but was not taking any medications for his condition.  (T. at 84, 85.)  Plaintiff also testified that he is "in the donut hole of [his] medical, [he] do[es]n't have glasses, [he] do[es]n't have some of the things that [he] need[s] to function because of the medical situation that you all know that's going on with the medical situation at the capitol and the medical cares and the medical treatment."  (T. 81.)  Plaintiff stated that, approximately two to three weeks prior, he "was told . . . that [he] ha[s] been shut out of the medical treatment . . . from an

out[-]of[-]state entity." (T. 82.) Plaintiff explained that he was no longer receiving medical care and told that he was "shut out of the system." (T. 89.) When Plaintiff tried to go to a hospital for treatment, he was not able to get any, stating "it's like a game they play." (T. 89.)

### b. Testimony of Dr. Butler

#### i. Plaintiff's Objection to Dr. Butler

Karen Butler, Ph.D., a psychologist, testified as the Commissioner's medical expert. (T. 67, 236.) *See* 20 C.F.R. § 1616(d)-(f) (discussing use of a psychological consultant for mental impairments). From the beginning of the hearing, the transcript shows Levin's strong objection to her testimony. (T. 67, 68-78.) Levin argued that Dr. Butler lacked objectivity "because she erroneously assumes *a priori* in all cases that no claimant can be found disabled at the fifth step, unless he or she first meets or medically equals a listing," (T. 13; *see* T. 69-70), based on testimony Dr. Butler gave in another matter in which Levin appeared and over which ALJ Thomas presided, (T. 69-70). The objection was overruled. (T. 77; *see also* T.13 n.2.)

Levin again raised the issue when it came time for Dr. Butler to testify. (T. 90; *see also* T. 92-93.) The discussion between the ALJ and Levin concerning Dr. Butler's role in the proceeding became rather heated at points, including the ALJ requesting that Levin not yell and several instances in which the ALJ and Levin were talking over one another. (T. 92, 96-99.)

## ii.    Plaintiff's Impairments

Dr. Butler testified that Plaintiff had the following impairments based on the record: borderline intellectual functioning, delusional disorder, and adjustment disorder combined with major depression, including a single episode with psychotic features. (T. 91.)  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, 12.02 (organic mental disorders), .03 (schizophrenic, paranoid, and psychotic disorders), .04 (affective disorders).  Dr. Butler opined that these diagnoses were present *from 2006 through December 2008* and the record showed Plaintiff experiencing delusions, paranoia, suspiciousness, anhedonia,[2] appetite disturbance, sleep disturbance, feelings of hopeless and helplessness, and diminished concentration.  (T. 93.)

Dr. Butler testified that, after December 2008, the record showed that Plaintiff was being treated for PTSD.  (T. 91.)  *See* 20 C.F.R. pt. 404, subpt. P, app. 1., 12.06 (anxiety related disorders).    Dr. Butler identified intrusive thoughts, hypervigilance, sleep disturbance, exaggerated startle, diminished concentration, and estrangement as symptoms of PTSD present in the record.  (T. 94.)  Dr. Butler opined that Plaintiff was moderately impaired in his activities of daily living, social functioning, and concentration, pace, and persistence.  (T. 94-95.)

Dr. Butler opined that, from April 2006 through December 2008, Plaintiff met the (C)(2) criteria under listing 12.03 for schizophrenic, paranoid, and psychotic disorders. (T. 95.)  But after December 2008, Dr. Butler noted these symptoms were no longer

---

[2] Anhedonia is the "inability to enjoy what is usually pleasurable."  *Miller-Keane Encyclopedia & Dictionary of Medicine, Nursing & Allied Health* 107 (Marie T. O'Toole ed., 7th ed. 2003).

present in the record and Plaintiff did not meet the (C) criteria under listing 12.06 in connection with his PTSD. (T. 95-96.) Dr. Butler opined that Plaintiff was limited to "simple and unskilled, work where there would be no rapid assembly line pace, work where there would be no high production goals, work where there would be brief and superficial contact with others in a job where servicing the public is not your primary task." (T. 96.)

### c. Testimony of Vocational Expert

The vocational expert asked Plaintiff to clarify some of the entries in Plaintiff's work history and the type of work that Plaintiff did for the employer. In 2002 and 2003, Plaintiff testified that he worked in housekeeping. (T. 106.) Between 1999 and 2005, Plaintiff also worked in security and at a special needs home. (*See* T. 108-12.) The vocational expert also asked Plaintiff about his past employment as a grocery worker. (T.111.) Plaintiff testified that he worked in grocery for 19 years and was a supervisor. (T. 111.) Because this employment was prior to 1991, however, the vocational expert excluded it. (T. 111-12.) The vocational expert testified that a hypothetical person of Plaintiff's age, education, work history, and impairments who is limited to simple, unskilled work where rapid pace or high production is not required involving brief, superficial contact with others could perform Plaintiff's past position in housekeeping and the additional positions of checker, bagger, and press tender. (T. 114-15.)

Levin asked the vocational expert to assume that Plaintiff's preoccupation with harassment were to occur two hours per day, two days per week and the resultant effect on Plaintiff's ability to work those positions identified by the vocational expert. (T. 117.)

The vocational expert testified that a preoccupation of this duration "would interfere with persistence and pace within the weekly job schedule" and preclude competitive employment.  (T. 117.)

### d.  ALJ's Decision

The ALJ found and concluded that Plaintiff has not engaged in substantial gainful activity since April 30, 2006, and Plaintiff has the severe impairments of borderline intellectual functioning, delusional disorder, adjustment disorder, and PTSD.  (T. 17-18.) The ALJ found and concluded that, between April 30, 2006, and December 31, 2008, Plaintiff's delusional disorder met the (C) criteria of listing 12.03 for delusional disorders in 20 C.F.R. pt. 404, subpt. P, app. 1, and Plaintiff was under a disability.  (T. 18, 19.)

As of January 1, 2009, however, the ALJ found and concluded that medical improvement occurred and Plaintiff was no longer under a disability.  (T. 19.)  The ALJ found and concluded that, beginning January 1, 2009, Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.  (T.19-21.)  The ALJ found that Plaintiff

> has had the residual functional capacity to perform a full range of work  at all exertional levels, but with the following nonexertional limitations: . . . [Plaintiff] is limited to work that involves simple unskilled tasks; . . . does not involve rapid, assembly line pace or high production goals; and . . . [does not involve] dealing with the public . . . [as] a primary job task.

(T. 21.)  The ALJ determined that only Plaintiff's past work as a watch guard constituted substantial gainful activity and Plaintiff was no longer cable to perform this past relevant work.  (T. 26.)  Based on the vocational expert's testimony and in consideration of

Plaintiff's age, education and work experience as well as the absence of any exertional limitations, the ALJ concluded that a significant number of jobs exist in the national economy that Plaintiff could perform and, therefore, Plaintiff has not been under as disability since January 1, 2009. (T. 27.)

In reaching his decision, the ALJ gave significant weight to the testimony Dr. Butler, finding it to be consistent with the September 2006 consultative examination of Alford Karayusuf, M.D., and the September 2006 mental residual-functional-capacity assessment of R. Owen Nelson, Ph.D., L.P. (T. 23.) These doctors each opined that Plaintiff was limited to simple, routine tasks that were repetitive in nature; should only have brief, superficial contact with others; and not have a primary responsibility of working with the public. (*See* T. at 23-24.)

The ALJ also noted that Dr. Butler's opinion was consistent with information provided by Melvin D. Coleman, L.P., Plaintiff's treating psychologist, referring to treatment notes between June 2007 and April 2008 and a mental residual-functional-capacity assessment form completed in December 2009. (T. 24) With respect to the December 2009 assessment, the ALJ stated the following:

> This treating source opined that [Plaintiff's] ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances is only moderately limited; and that [Plaintiff's] ability to accept instruction and respond appropriately to criticism from supervisors is only mildly limited. On the other hand, this treating psychologist also opined that [Plaintiff] is not able to perform simple, unskilled, low stress work, 8 hours per day, five days per week on a sustained basis. The undersigned has accorded little weight to this opinion as it is inconsistent with the evidence of record taken as a whole, including, but not

11

limited to, the Mental Residual Functional Capacity Assessment that accompanied this opinion, which was completed by the very same treating psychologist; this written assessment, as has been previously noted, is otherwise generally consistent with Dr. Butler's testimony concerning [Plaintiff's] mental residual functional capacity.

(T. 25 (citation omitted).)

In addition, the ALJ found that Plaintiff "has described activities of daily living which are not limited to the extent that one would expect, given the allegation of total incapacitation by reason of mental impairment." (T. 25.)

### 4. Post-Hearing Proceedings & the Instant Action

Plaintiff again sought review of the ALJ's decision. (T. at 5.) On January 3, 2012, the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff brought this action on February 8, 2012. (Docket No. 1.) Plaintiff moved for summary judgment on June 21, 2012. (Docket No. 8.) The Commissioner moved for summary judgment on September 4, 2012. (Docket No. 13.)

### B. Disability-Related Examinations & Assessments

#### 1. 2006

Plaintiff had a disability field-office interview in July 2006. (T. 301.) The interviewer observed that Plaintiff had difficulty speaking coherently, concentrating, and answering questions. (T. 300.) Plaintiff also "answered slowly and seemed confused." (T. 301.) The interviewer noted that Plaintiff had a "form from dr. showing that he is delusional but he denied auditory or visual hallucinations or disturbed thinking." (T.

301.)  The interviewer also reported that Plaintiff refused to take his anti-psychotic drugs. (T. 301.)

As part of a 2006 disability report, Plaintiff indicated that he had "[l]earning disabilities, mental health problems, delusional disorder, adjustment disorder [and] depression . . . ."  (T. 303.)  Plaintiff reported that these impairments interfere with his ability to function and concentrate.  (T. 303.)  Plaintiff also reported having delusions, trouble reading, and trouble holding down a job.  (T. 303.)   Notes from this time period also indicate that Plaintiff "seems to be in denial about his disability and there is no medical evidence until recently."  (Tr. 309.)

Plaintiff's significant other also completed a functional report regarding Plaintiff. She noted that Plaintiff "wakes up irritable due to lack of sleep"; "eats very little"; and "tries to go outside but comes back saying people are following him."  (T. 325.) Plaintiff's significant other also stated that Plaintiff has difficulty reading labels and is afraid to leave his apartment because he believes people are following him.  (T. 326, 327, 328, 329, 330, 331, 322.)

Plaintiff was seen by Dr. Karayusuf for a consultative examination in September. (T. 474, 476.)  Plaintiff's chief complaint during the examination was depression due to the loss of several family members.  (T. 474.)  With respect to Plaintiff's preoccupation with harassment by the minister, Dr. Karayusuf noted that Plaintiff "was much more vague with [him] and was unwilling to go into any more details, other than [Plaintiff] emphasiz[ing] to [him] . . . that this minister is a powerful person . . . out to do harm to [Plaintiff] because '[Plaintiff] stood up to him, and [Plaintiff] reported him for civil rights

violations.'" (T. 474-75.) Plaintiff reported difficulty sleeping and Dr. Karayusuf observed that Plaintiff was anxious and his concentration and memory were diminished. (T. 475.)

Dr. Karayusuf concluded that Plaintiff had a delusional order (T. 476) and the following limitations:

> He is able to understand, retain and follow simple instructions. He is restricted to very brief, superficial interactions with fellow workers, supervisors and the public. It would be best for him to work alone as much of the time as possible, as this would diminish his preoccupation with his delusion. Within these parameters, he is able to maintain pace and persistence.

(T. 476.)

Dr. Nelsen conducted a psychiatric review technique and a mental residual-functional-capacity assessment of Plaintiff in September as well. (T. 480, 494, 496.) Dr. Nelsen concluded that Plaintiff had a delusional disorder, which was "largely in remission with medication," and an "adjustment disorder with anxiety and depression," and that these were severe impairments. (T. 482, 483, 492.) Dr. Nelsen concluded, however, that neither of these impairments met or medically equaled listings 12.03 and 12.04. (T. 492.) Dr. Nelsen found Plaintiff to have mild restrictions in activities of daily living; moderate difficulties with social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (T. 490.)

As for Plaintiff's mental residual functional capacity, Dr. Nelsen concluded the following:

[Plaintiff] retains the capacity to concentrate on, understand, and remember routine, repetitive instructions, but would have marked problems with both detailed and complex instructions.

[Plaintiff's] ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks.

[Plaintiff's] ability to interact and get along with co-workers would be moderately impaired, but adequate for brief, infrequent, and superficial contact.

[Plaintiff's] ability to interact with the public would be moderately impaired, but adequate for brief, infrequent and superficial contact.

[Plaintiff's] ability to follow an ordinary routine would be moderately impaired but adequate to function with the ordinary level of supervision found in most customary work settings.

[Plaintiff's] ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.

(T. 496.)

### 2. 2007

In January 2007, Plaintiff's significant other completed another functional report. (T. 345.) She reported that Plaintiff still had difficulty sleeping and preparing his own meals. (T. 346, 347.) She also stated that Plaintiff has to be reminded to take his medicine and "sometimes thinks the medicine will harm him." (T. 347.) Plaintiff's significant other reported that Plaintiff does not go outside for days at a time because "he is fearful of people following him and being assaulted by unknown persons." (T. 348;

*see also* T. 349, 351, 352.)  Plaintiff's significant other stated that she often accompanied him when he went out.  (T. 348, 349

Around the same time, Plaintiff also completed a functional report.  (T. 354, 361.)  Plaintiff reported "look[ing] out the window notic[ing] people posted up looking up at [his] window when they notice that [he] see[s] them they drive away then send another car to sit in same exact spot and look up at [his] windows."  (T. 354.)  When asked if he needed help or reminders to take his medicine, Plaintiff checked "yes" and noted "it[']s poison."  (Tr. 356.)  Plaintiff also reported that he does not cook for himself and once, when he tried to cook for himself, he "forgot the food on the stove" and it burned.  (T. 356.)  Plaintiff reported having difficulty with household chores and understanding what he is reading.  (T. 357, 358.)  Plaintiff stated that he visited his son a few times per month and, when he attended church, "they would send people in the church that [he]'d see sitting on [his] street."  (T. 358.)  Plaintiff also report difficulty with authority figures and getting along with others.  (T. 360.)

In July 2007, Plaintiff reported that "[his] conditions are worse because [he is] currently homeless and [he] do[es not] have a stable environment to get well."  (T. 369.)  Plaintiff stated that he tires easily and has difficulty "remembering, concentrating, and focusing."  (T. 369.)

### 3.  2008

On January 21, 2008, Ray M. Conroe, Ph.D., L.P., affirmed the medical determination of Dr. Nelsen.  (T. 510.)

### C. Medical History

#### 1. 2006

On March 13, 2006, Plaintiff was referred to NorthPoint Health & Wellness Center ("NorthPoint") and seen by Ariane Getz, M.A. (T. 450, 514.) Plaintiff "reported that he was depressed as he has been unable to maintain work." (T. 450.) Plaintiff said that the minister was "'using his power' to keep him down" and that he "has tapped [Plaintiff's] phone, follows him, and uses associates to track him." (T. 450.) Plaintiff reported that this activity "has been going on for the last three years, and [Plaintiff] now believes that [the minister] may be plotting to kill him." (T. 450.) Getz noted that Plaintiff's "thoughts were clear and organized, however, he appeared very paranoid and delusional throughout the intake session." (T. 450.)

Plaintiff was also assessed by Edward Posey, M.D., who opined "that [Plaintiff] does have a delusional disorder." (T. 451.) Dr. Posey noted that Plaintiff did not believe he needed any medication at this time and that there will be an "attempt to engage [Plaintiff] at another level to see if we can convince him that antipsychotic medication might benefit him." (T. 451.) Plaintiff was to schedule individual therapy sessions. (T. 450, 451.)

Two days later, on March 15, Plaintiff was seen at Hennepin County Mental Health Center ("HCMHC"). (T. 469.) During the intake process Plaintiff was "[d]efensive and suspicious—will only say that tension, irritability, sleep problems, and preoccupation have resulted from 'harassment' by a former employer against whom he has filed 'civil rights violation' charges." (T. 469.) Plaintiff also reported that he was

being followed and the subject of surveillance for three to four years. (T. 469.) The intake notes also refer to the NorthPoint appointment just days before: "Suggests recently NorthPoint MH screening—'didn't like their approach.'" (T. 469. The intake notes further state that Plaintiff "[i]s aware that others regard his beliefs/perceptions as paranoid . . . unwilling to entertain that possibility." (T. 469 (ellipses in original).)

Plaintiff returned to HCMHC at the end of April and was seen by Chuck Parsons, Li.C.S.W. (T. 452, , 461, 464, 467.) Plaintiff told Parsons about the "falling out" with the minister and Parsons noted that Plaintiff's

> perception of the situation has expanded to the belief that he is being followed and this includes surveillance by busses and other unusual means. [Plaintiff] feels that he has become the brunt of forces that he could not have anticipated, and that this religious organization has considerable impact in other areas of government, business, etc. [Plaintiff] feels that the stress and anxiety of this situation has taken a great deal out of him and has become a preoccupation which has been unhealthy for him and he is rather worn out with it.

(T. 464.) Parsons noted that "[a]side from this area, [Plaintiff's] thought processes seem to be normal and well organized although it would seem that this issue has spilled over into relationships, world view, ability to take care of necessary day-to-day functions, work, etc." (T. 464.) Parsons described Plaintiff as "vigilant" and noted that Plaintiff "has trouble focusing." (T. 464.) Parsons listed a working diagnosis of "Delusional Disorder, Persecutory Type (297.1); Adjustment Disorder, Mixed, With Anxiety and Depression (309.28); R/O ADHD and Learning Disorder; R/O Major Depression." (T. 465.)

Parsons referred Plaintiff to Ngozi Wamuo, M.D., for a psychological assessment and Plaintiff was seen by Dr. Wamuo the same day.  (T. 462, 463.)  Plaintiff told Dr. Wamuo that he felt that he was being tortured and "'the more I talk about this, the more I get tortured.  They follow me around.'" (T. 461.)  Dr. Wamuo noted that Plaintiff "is preoccupied with the thought that people are torturing him, following him around, both in van and in UPS truck, even through his friends, when he talks to them."  (Tr. 461.)  Plaintiff reported difficulty sleeping and feeling helpless and hopeless.  (T. 461.)  Plaintiff also talked about not "want[ing] to lose control."  (T. 461.)  Plaintiff told Dr. Wamuo that he did not like taking medication, but ultimately agreed to try Seroquel[3] for his sleeplessness and anxiety.  (T. 460, 462.)   Dr. Wamuo listed a working diagnosis of "Major Depressive Disorder, single episode, with psychotic features" and "Psychotic Disorder, Not Otherwise Specified, rule out Delusional Disorder (Paranoid Type)." (T. 462.)

Plaintiff had a follow-up visit with Parsons in May.  (T. 459.)  Plaintiff reported that the Seroquel was "very helpful" and spent much of the session discussing difficulties with housing.  (T. 459.)   When asked about his preoccupation with the harassment, Plaintiff "indicated that this was going better and chose not to talk about it much, at least not directly."  Parsons observed that Plaintiff "relates in a rather intense fashion, chooses his words carefully and some of his answers are quite measured and circumspect." (T. 459.)

---

[3] Seroquel is a brand name for quetiapine, a medication "used to treat nervous, emotional, and mental conditions." *Quetiapine (By Mouth) (Seroquel)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011909/ (last visited February 7, 2013).

Plaintiff next saw Parsons in June. (T. 458.) Plaintiff was again primarily concerned with housing. (T. 458.) Plaintiff reported continuing with Seroquel. (T. 458.) Parsons's notes from this visit state that, "[i]nterestingly, [Plaintiff] does not mention at all the past preoccupation with the minister, the Lutheran Church, etc. etc. He has stated that he has moved on from this." (T. 458.) Parsons encouraged Plaintiff to make an appointment with Dr. Wamuo. (T. 458.)

In July, Parsons completed a "Request for Medical Opinion" form. (T. 452.) Parsons indicated that Plaintiff had a delusional disorder and adjustment disorder, mixed anxiety and depressed mood. (T. 452; *see also* T. 457, 574.) Parsons noted that Plaintiff had a mental illness and would not be able to work in the foreseeable future. (T. 452; *see also* T. 574.)

### 2. 2007

In January, Plaintiff completed a "Depression Questionnaire." (T. 363, 364.) Plaintiff stated that his depression was caused by the deaths of several family members, his housing and economic conditions, and "not being able to move around freely without being followed." (T. 363.) Plaintiff believed "there's something wrong with [his] brain," noting a family history of depression and alcohol dependency. (T. 363.) Plaintiff stated that he had difficulty sleeping and he was no longer as active as he used to be. (T. 363.) Plaintiff stated that he "really do[es]n't enjoy going out in the public anymore[;] it[']s a chore to do so[,] anxious when [he] ha[s] to leave the ap[artmen]t." (T. 363) As to whether Plaintiff was taking any medication, Plaintiff stated that he had been prescribed some in the past, but had recently switched treatment providers and new medication had

not yet been prescribed.  (T. 364.)  Plaintiff explained that "the ones they prescribed at first w[]ere antipsychotic medication—they said they 'would help me sleep[.]'  I believe they were trying to poison me—my mind.  [A]nd they kept trying to increase the doses quite often."  (T. 364.)  Plaintiff also explained that he was afraid of hospitals because "they will try to kill me in there[,] make up some illness and kill me dead."  (T. 364.)

On February 15, 2007, S.V. Petzel, Ph.D., L.P., completed a "Request for Medical Opinion" form regarding Plaintiff.  (T. 573.)  Dr. Petzel diagnosed Plaintiff with an adjustment disorder with mixed anxiety and depressed mood (309.28 DSM Code), and noted "primary difficulty concentrating, focusing, [and] trusting others."  (T. 573.)  Dr. Petzel indicated that Plaintiff would be able to perform limited employment but he was uncertain as to when and also indicated that Plaintiff would not be able to work in the foreseeable future.  (T. 573.)  Dr. Petzel opined that Plaintiff did have a mental illness.  (T. 573.)

On May 10, 2007, Plaintiff began seeing Coleman.[4]  (T. 612.)  Plaintiff told Coleman that Plaintiff needed to "to come to counseling to resolve the stress he has been subjected to, following a formal harassment campaign he endured, via people from his previous job with a local church."  (T. 612.)  Coleman concluded that Plaintiff was suffering from PTSD, and "recommended that [Plaintiff] pursue stress reduction therapy, in the form of anxiety management training, systematic desensitization, and increased problem-solving acquisition.  It is also recommended that therapy goals include reduction of his feelings of persecution and elimination of remaining emotional distress."  (T. 609.)

---

[4] Most of Coleman's notes are handwritten and difficult to read.  (*See also* Pl.'s Mem. at 7.)

Coleman also noted the presence of depression and that Plaintiff's economic circumstances were a "huge obstacle to his embracing the therapeutic recommendations." (T. 608, 609.)  In addition, Coleman noted that Plaintiff's "IQ testing seems well below his current levels of intellectual functioning" and the "test scores are totally inconsistent with his success as a plumber, electrician, and general connoisseur of life."  (T. 606, 610.)

Plaintiff saw Coleman regularly, approximately once per week, in May through mid-July.  (T. 598, 599, 600, 601, 602, 604, 611.)  During this time, Coleman encouraged Plaintiff to pursue post-secondary education courses through a local technical college. (T. 598, 604.)  In one of their sessions, Coleman noted that Plaintiff "is still traumatized from the years of embattled conflicts, and is using the longer sessions to vent his frustrations, which will ultimately offer an emancipating freeness, and ability to focus on school.  Otherwise the anger and outrage could distract him from his ultimate goals." (T. 604.)  Coleman also worked on relaxation techniques with Plaintiff and assisted with housing issues.  (T. 601, 599, 598.)

On June 14, Coleman completed a "Request for Medical Opinion" form, indicating that Plaintiff had PTSD and would likely be able to work "c. 2008."  (T. 603.) In the comments section, Colman wrote that Plaintiff, "while having suffered PTSD, surrounding employer harassment, community attacks and physical assaults, over a four[-]year period, is now in therapy for depression, anxiety, and feelings of persecution." (T. 603.)

Later that month, Plaintiff "requested a more definitive economic assistance waiver of work requirement in response to which [Coleman] wrote a summary of services." (T. 601.) Coleman wrote a letter stating that Plaintiff has been suffering from PTSD, "is being provided anxiety management therapy, and it is not suggested that he be required to work during the therapeutic process, which is expected to last throughout the remainder of the year."[5] (T. 568; *see also* T. 621.) Coleman stated that Plaintiff "is currently experience symptoms, including hypervigilance around daily encounters of feigned aggression, difficulty sleeping, anticipatory anxiety, estrangement from previous friendships, and recurrent distress in response to continual episodes of community provocation." (T. 568; *see also* T. 621.)

During an early August session, Coleman noted that Plaintiff "is doing well in mastering general relaxation techniques, and working out at the gym as well." (T. 596.) Coleman also provided Plaintiff with "anxiety reduction training." (T. 596.) A week later, Coleman made the following observation:

> Harassment is still occurring though he isn't as affected by it as before. He is practicing the relaxation exercises and understands the dynamics better than before. Previously he wondered if they were planning to attack him, whereas now he knows it[']s more being employed to break his will, and to provoke him into a[] self[-]incriminating act.

(T. 595.) Plaintiff had a total of four sessions with Coleman in August. (T. 592, 593-94, 595, 596.)

---

[5] Coleman's June 2007 letter states that it is to be considered "in conjunction with the attached Psychological Opinion." (T. 568.) In the record, the opinion that immediately follows this letter is Dr. Lewis's opinion from December 2008. (T. 569.) Three pages later, however, is the "Request for Medical Opinion" form completed by Coleman in June 2007. (T. 571.) It seems most likely that this is the "Psychological Opinion" that Coleman is referring to in his letter.

At some point, Coleman referred Plaintiff to the Shakti Clinic of Oriental Medicine ("Shakti") for acupuncture treatments. (T. 564.) Plaintiff's first visit was in late August 2007. (T. 521, 565; *see* 563.) Plaintiff reported having "piercing" headaches "between [his] eyes" and PTSD. (T. 565.) Plaintiff also reported that "'people [were] watching him.'" (T. 565.) Plaintiff indicated that he did not like pharmaceutical remedies and "prefers natural therapies." (Tr. 564.) Plaintiff had weekly acupuncture treatments through the end of September. (T. 560, 561, 562, 563.) In general, Plaintiff reported that his headaches were improving and that there was "major improvement" in his stress level, anxiety, and ability to sleep. (T. 563; *see also* T. 560, 562.)

On September 7, Plaintiff came to schedule a future appointment with Coleman. (T. 590.) Coleman noted that Plaintiff was in school and "feeling good." (T. 590.) There are no further entries, however, until November when Coleman wrote that he was closing Plaintiff's file. (T. 590.)

Plaintiff resumed his acupuncture treatments in mid-October and continued with weekly treatments for approximately five weeks. (T. 551, 554, 555, 557, 558, 559.) Plaintiff reported that his headaches, stress, and insomnia returned during the three weeks he did not have treatment. (T. 559.) With regular treatments, Plaintiff's headaches, tension, and insomnia improved. (T. 551, 554, 555, 557, 558.) Plaintiff's "mood [and] emotions [were also] more even." (T. 554.)

In mid-November, Plaintiff sought authorization for additional acupuncture treatments. (T. 553.) Plaintiff's therapist noted that the treatments "have successfully and immediately turned [Plaintiff's] condition around. There was immediate relief in the

headaches and insomnia.  The [treatments] keep [Plaintiff's] stress/tension/levels down."
(T. 553.)  Plaintiff's therapist noted that Plaintiff prefers "natural means" rather than
prescription drugs.  (T. 553.)  Plaintiff's therapist also "noted that after beginning
[acupuncture treatments], [Plaintiff] is expressing 'paranoia' . . . (the sense that he is
being watched/followed, etc.)."  (T. 553; *see also* T. 552.)

Plaintiff had one additional acupuncture session in mid-December.  (T. 550.)  As
before, Plaintiff reported that his headaches returned without treatment and acupuncture
helped his insomnia.  (T. 550.)

Plaintiff also resumed seeing Coleman in mid-December.  (T. 590.)  Plaintiff
reported that he had completed two courses at the technical college during the first
semester and was now going "to begin barbering school."  (T. 590.)  Coleman's notes
indicate that, "[w]hile [Plaintiff] appears validated, having succeeded in his classes; he
appears tenuous as it relates to his financial vulnerability."  (T. 589.)  Coleman also noted
that Plaintiff "does not appear to be a candidate for disability insurance, either SSI or
SSDI.  Instead, he appears more oppressed and obstructed in his goals."  (T. 589.)  At the
end of December, Coleman noted that Plaintiff "appears continually affected by
unemployment, harassment, and bills, which overwhelm him and his partner."  (T. 588.)

Coleman also completed a "Request for Medical Opinion" form at the end of
December.  (T. 620.)  Coleman indicated that Plaintiff was diagnosed with PTSD and he
was "uncertain" as to how long he expected Plaintiff's condition to last, noting "3 or 4
years possibly."  (T. 620.)  Coleman wrote that Plaintiff "will not be able to function until
he has overcome the obstacles impeding his independent living aims" and "[o]nce

[Plaintiff] is economically and emotionally stabilized, it is recommended that he be reevaluated for . . .[6] permanent residuals at that time—currently in therapy." (T. 620.) Coleman checked the box indicating that Plaintiff "will not be able to perform any employment in the foreseeable future," and noted that he "will reevaluate annually." (T. 620.) When asked whether Plaintiff has a developmental disability, mental illness, learning disability, or chemical dependence, Coleman checked "No" in each instance. (T. 620.)

### 3. 2008

In the months of January and February 2008, Plaintiff had three acupuncture sessions. (T. 547, 548, 549.) Again, Plaintiff's headaches and insomnia were worse when he did not have regular treatments and better with treatment.

Plaintiff had four visits with Coleman in January. (T. 588, 587, 586, 585.) On January 24, Plaintiff reported that he had been approved for housing in the greater metro area, but sent a letter requesting a different location "given his treatment, school requirements, family membership, public transportation, etc. are all in the city proper." (T. 586.)

During Plaintiff's February 6 session, Coleman noted that Plaintiff "is better informed of the harassment procedure; and has come to terms that it is not an indictment on him, but more a phenomenon of the racist societal . . .[7] in Minnesota." (T. 584.) Coleman noted that Plaintiff "talked at length about the conspiracy in Minneapolis, and

---

[6] Illegible. *See supra* n. 4.
[7] Illegible. *See supra* n. 4.

those who've harassed him."  (T. 584.)   Coleman provided Plaintiff with "anxiety management training, which he had not . . .[8] for some time.  He needs practice."  (T. 584.)

Plaintiff and Coleman also "[c]entered around the harassment issue, and his approach to addressing aggressively, rather than passively" in the following session on February 13.  (T. 583.)  Plaintiff's next session with Coleman was on February 20.  (T. 582-83.)   While the notes from this session are largely illegible, Coleman's notes suggest that Plaintiff's progress had plateaued and Coleman wrote that he "will close [Plaintiff's] therapy file unless this changes."  (T. 582.)  After this session, Coleman also wrote a letter on Plaintiff's behalf regarding Plaintiff's housing assignment.  (T. 566, 582.)   Given that Plaintiff's "medical, psychological, and academic resources reside within the metropolitan Twin City area" and Plaintiff's lack of transportation, Coleman requested that an alternative location be considered.  (T. 566.)  Coleman also noted that Plaintiff was "approved to start school."  (T. 566.)  Plaintiff's final session with Coleman was on February 27.  (T. 582.)

Beginning in March, Plaintiff resumed weekly acupuncture treatments.  (T. 545, 545, 544.)   In one of Plaintiff's March sessions, Plaintiff's therapist noted "less hypervigilance."  (T. 544.)  Plaintiff continued weekly treatments through April and May (T. 533, 534, 535, 536, 539, 541, 542, 543.)  Overall, Plaintiff's headaches and insomnia improved with treatment, (T. 533, 534, 540. 543), although Plaintiff experienced occasional relapses in which his headaches increased and he had difficulty sleeping, (T.

---

[8] Illegible.  *See supra* n. 4.

535, 536, 539, 542.)   During this time, Plaintiff's therapist also noted some "hypervigilance."   (T. 539, 541.)   Plaintiff again sough authorization for additional treatments in early May.  (T. 537.)  The authorization form noted the success of treatment to date, including "[l]less overall anxiety [and] subsequently less headaches [and] insomnia, (which appear to contribute to the 'paranoia')," and Plaintiff's opposition to prescription drugs.  (T. 537.)

Plaintiff had three sessions of acupuncture in both June and July.  (T. 527, 528, 529, 530, 531, 532.)  Plaintiff's condition remained about the same.  Plaintiff's therapist noted some hypervigilance in two of the visits.  (T. 531, 532.)  In July, Plaintiff skipped one week of treatment and, at his next session, reported that he "did ok[ay]."  (T. 527.)

In the beginning of August, a "stressful situation retriggered [Plaintiff's] tension headaches and hypervigilent perceptions of events around [him.]"  (T. 526.)  Plaintiff's insomnia also returned.  (T. 526.)  Plaintiff's next appointment was two weeks later, and he reported continuing difficulty with sleep, headaches, and stress.  (T. 525.)  Plaintiff's symptoms did not improve the following week and Plaintiff reported that "'street noises [were] stressing him out.'"  (T. 524.)  Plaintiff's therapist noted that Plaintiff continues to "[r]efuse[] to use pharmaceuticals for his tension headaches/hypervigilance."  (T. 524.)

On August 12, Coleman wrote a letter to Levin documenting his therapeutic involvement with Plaintiff.[9]  Coleman wrote that Plaintiff was seen between May 2007 and February 2008;  provided with individual counseling sessions and anxiety

---

[9] Although this letter is dated August, 12, 2007, it appears that the year is a typographical error and should be 2008, as Coleman speaks in the past tense concerning Plaintiff's treatment:  Plaintiff "was seen from May, 2007 to February 2008, for [PTSD] symptoms, subject to four years of employer initiated harassment."  (T. 567.)

management therapy; "and is now being seen on an as needed basis."  (T. 567.)  Coleman also wrote that Plaintiff "attended regularly, and learned the anxiety management techniques well."  (T. 567.)  In a post-closing session note on August 14, Coleman noted that Plaintiff "admitted to continued harassment, . . . ,[10] and no way to fight against the injustice."  (T.580.)  Plaintiff also had not been successful in getting back into school.  (T. 580.)

At the end of August, Plaintiff sought authorization for additional acupuncture treatments.  (T. 522.)  This time, Plaintiff's therapist noted that there has been a "relapse" in Plaintiff's symptoms due to both a lapse in treatments and Plaintiff's PTSD.  (T. 522, 523.)

Plaintiff had an additional post-closing session with Coleman on December 4.  (T. 578.)  During this session, Plaintiff "talked of still being consumed with the harassment issues, though more threatening and . . .[11] in his tone; insinuating the need for collaboration in ways which are more politically than therapeutically related."  (T. 578.)

Plaintiff returned to NorthPoint on December 11, 2008, where he was seen by Fredrekia Lewis, M.D.  (T. 519.)  Plaintiff brought a medical assistance form to be completed, on which Dr. Lewis noted that Plaintiff had a history of PTSD and referred Plaintiff to Juanita Benton, Psy.D., L.P., for a psychiatric evaluation.  (T. 519, 520, 569.)  Dr. Lewis also checked the box indicating that Plaintiff "will not be able to perform any employment in the near future."  (T. 569.)

---

[10] Illegible.  *See supra* n. 4.
[11] Illegible.  *See supra* n. 4.

Benton noted that Plaintiff had "a letter from [Coleman] stating that [Plaintiff] has PTSD." (T. 519.) While meeting with Benton, Plaintiff reported being followed by UPS and FedEx trucks. (T. 519.) "During the session, a UPS and later a Fed[Ex] truck came down the alley. [Plaintiff] exclaimed loudly that they were after him." (T. 519.) Plaintiff explained that he was first followed by a mail truck and referred to this as "'institutional racism.'" (T. 519.) Plaintiff told Benton that "the only thing that makes him angry is that he 'got the Nazis treatment' in referring to the entities that are following him." (T. 519.)

In addition, Plaintiff told Benton about the minister and the civil rights charges. (T. 519.) Benton noted that Plaintiff "believes his phone is tapped and he hears hissing and echo[e]s on his phone. [Plaintiff] reports that 'a person came through the phone' and it was the minister[']s sister." (T. 519.) Plaintiff also "report[ed] seeing a [M]inneapolis police car[] while walking with his son and the police stated on the intercom 'here comes a steer and a deer.[']" (T. 519.) Plaintiff told Benton "[h]e was robbed at gun point while with his wife[] and believes the [M]inneapolis police sent someone to rob him." (T. 519.) Benton concluded Plaintiff had a delusional disorder and referred him to Emmitt Parks, Li.C.S.W., for a mental health assessment. (T. 517, 518, 519.)

Plaintiff met with Parks the next day. (T. 517, 518.) Parks

> was unable to complete th[e] assessment due to [Plaintiff's] extreme discomfort with the interview process. [Plaintiff] was extremely guarded and[]suspicious in his presentation. [Plaintiff spoke in a very soft voice and he seem[ed] to withdraw even more when [Parks] pointed this out to him. [Plaintiff] did not want to elaborate on his reason for seeking

> services and only wanted to say that he has PTSD.  He was
> hesitant to reveal the source of his PTSD.

(T. 518.)  Plaintiff ended the session after approximately ten minutes.  (T. 518.)

### 4.  2009

Plaintiff returned to NorthPoint on February 12, 2009, and was seen by Dr. Lewis.  (T. 516.)  Plaintiff had a "Welfare form" with him.  (T. 516.)  Dr. Lewis noted that Plaintiff had PTSD by history and "advised, again, strongly to continue his follow[-]up with Mental Health and also have Mental Health document his disability based on his visits to the office."  (T. 516.)  Dr. Lewis also completed a "Medical Opinion" form at this time, stating that Plaintiff has PTSD; "will not be able to perform any employment in the foreseeable future; and is "[f]ollowed by mental health."  (T. 619.)  When asked whether Plaintiff has a developmental disability, mental illness, learning disability, or chemical dependence, Dr. Lewis checked "Unknown" in each instance.  (T. 619.)

Plaintiff next saw Dr. Lewis in August, complaining of low back pain and needing another medical-assistance form completed.  (T. 514.)  Plaintiff was given some medication for the pain and Dr. Lewis noted that Plaintiff "will continue follow-up with his mental health provider for [PTSD]." (T. 514.)

On November 11, Levin asked Coleman to complete a questionnaire and mental residual-functional-capacity assessment concerning Plaintiff's condition.   (T. 624.)  These documents are particularly significant with respect to Plaintiff's motion for summary judgment.  As part of the questionnaire, Coleman listed PTSD as Plaintiff's mental impairment, with accompanying symptoms of "insomnia, startle effect,

hypervigilance, recurring distressing thoughts, aversion to trauma images, estrangement and social isolation, [and] difficulty concentrating."  (T. 624.)  When asked if Plaintiff is "able to perform simple, unskilled, low stress work 8 hours per day, 5 days per week on a sustained (i.e., longer than three months) basis," Coleman circled, "NO."  (T.624.)

The questionnaire also asked Coleman to complete a mental residual-functional-capacity assessment and "*circle* [his] responses to differentiate them from the *prior* responses."  (T. 624 (emphasis added).)  These "prior responses" reflected Plaintiff's limitations as previously assessed by Dr. Nelsen, the state agency psychologist.  (*Compare* T. 494-95 *with* T. 625-26.)  Coleman did not circle anything on the assessment form.  (*See* T. 625-26.)

### 5.  2010

The record contains no medical evidence for 2010.

### 6.  2011

On January 6, 2011, Coleman wrote a letter on Plaintiff's behalf concerning Plaintiff's discontinued healthcare benefits, stating:

> Please note that [Plaintiff], a patient since May 10, 2007, has been unable to receive regular therapy since the latter months of 2009, due to the loss of full health care insurance coverage.  Limited to four local hospitals for services, his relationship with this therapist has been reduced to a crisis[-]based service model.  This void in therapy has precluded completion of the treatment plan in addressing [PTSD], secondary to continuing unemployment, and past documentation of social stressors stemming from this situation.

(T. 628.)

### III. Analysis

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* (quotation omitted).

DIB and SSI benefits are available to disabled individuals. *See* 42 U.S.C. §§ 423(a)(1), 1381a, 1382(a); *see also* 20 C.F.R. §§ 404.315, 416.202. An individual is considered to be disabled if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 42 U.S.C. § 423(d), 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met only if a claimant has a severe physical or mental impairment, or impairments, that renders him unable to do his previous work or "any other kind of substantial gainful work which exists in the

national economy." 42 U.S.C. § 1382c(a)(3)(B); *see also* 42 U.S.C. § 423(d)(2)(A), 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(1); *see also* 20 C.F.R § 404.1520a(a) (additional considerations for evaluating severity of mental impairments). The ALJ "consider[s] whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work." *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

Neither Plaintiff nor Commissioner disputes the ALJ's finding of disability through December 31, 2008. (*See* Pl.'s Mem. at 4 (Docket No. 8); Comm'r's Mem. at 9 (Docket No. 13).) Rather, the issue here is the ALJ's conclusion that "[m]edical improvement occurred as of January 1, 2009," and Plaintiff's disability ended. (T. 19.) While the ALJ used the term "medical improvement," this is a case in which [the ALJ] determined in a single proceeding the fact of [Plaintiff's] disability, the extent of the disability, and the duration of the disability," and as such, is not a medical-improvement case. *Camp v. Heckler*, 780 F.2d 721, 721-22 (8th Cir. 1986).[12] "[T]he determinative

---

[12] *See also Ness v. Sullivan*, 904 F.2d 432, 434 n.4 (8th Cir. 1990) (applying *Camp* while noting other circuits apply medical-improvement standard); *Eckelstafer v. Barnhart*, Fed. App'x 185, 186 (8th Cir. 2002) (applying *Camp*); *Dorsey v. Apfel*, 133 F.3d 921 (8th Cir. 1998) (Table) (same); *accord Babcok v. Astrue*, Civil No. 11-3109, 2013 WL 160332, at *1 n.2 (W.D. Ark. Jan. 15, 2013) ("When, in a single proceeding, the fact of disability, the extent of disability, and the duration of disability are all determined, the case is not a medical improvement case." (citing

question, as usual, is whether there is substantial evidence on the record as a whole to support the ALJ's decision that [Plaintiff] is capable of performing gainful work." *Clausen v. Astrue*, No. 4:07cv3136, 2008 WL 501525, at *8 (D. Neb. 2008). Thus, this Court must determine whether substantial evidence in record as whole supports the ALJ's conclusion that Plaintiff's severe impairments did not meet or medically equal a listing as of January 1, 2009.

Plaintiff bears the burden of establishing that his condition meets or equals all of the listing's specified medical criteria. *McCoy v. Astrue*, 648 F. 3d 605, 611 (8th Cir. 2011). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. An impairment that manifests only some of the listing criteria, no matter how severely, does not qualify." *Id.* at 611-12 (quotation and citation omitted). In order to meet listing 12.03 for schizophrenic, paranoid, and other psychotic disorders, which are

---

*Camp*, 780 F.3d at 721-22)). *But see Burress v. Apfel*, 141 F.3d 875, 879 (8th Cir. 1998) (applying medical-improvement standard). Commenting on the tension concerning the use of the medical-improvement standard in cases involving a closed period of disability within the Eighth Circuit, a federal court sitting in the Northern District of New York stated:

> The Eighth Circuit has also addressed the issue, but the current holding of the Circuit is unclear. Originally the Court in *Camp* found that a closed period of disability did not constitute a " 'termination' or 'cessation' case" as required, and therefore the medical improvement standard did not apply. *Camp v. Heckler*, 780 F.2d 721, 721–22 (8th Cir. 1986). Four years later, the Eighth Circuit again rejected the medical improvement standard for closed period cases noting that *Camp* was the current law of the circuit. *Ness v. Sullivan*, 904 F.2d 432, 435 n. 4 (8th Cir. 1990). However, in a later case, the Court applied the medical improvement standard to an individual with a closed period of disability without reference to either *Camp* or *Ness*. *Burress v. Apfel*, 141 F.3d 875 (8th Cir. 1998).

*Chavis v. Astrue*, No. 5:07-CV-0018 (LEK/VEB), 2010 WL 624039, at *5 (N.D. N.Y. Feb. 18, 2010); *see also Shepherd v. Apfel*, 184 F. 3d 1196, 1200 (10th Cir. 1999) (noting unsettled state of the law in the Eighth Circuit in light of *Camp*, *Ness*, and *Burress*). As best as this Court is able to discern from the more recent, albeit unpublished, decisions of the Eighth Circuit and the decisions of our sister federal district courts within the Eighth Circuit, *Camp* continues to remain the law of the Circuit.

"[c]haracterized by the onset of psychotic features with deterioration from a previous level of functioning," 20 C.F.R. pt. 404, subpt. P, app. 1, 12.03, Plaintiff must meet either *both* the (A) *and* (B) criteria, *or* the (C) criteria:

    A.  Medically documented persistence, either continuous or intermittent, of one or more of the following:

    1.  Delusions or hallucinations; or

    2.  Catatonic or other grossly disorganized behavior; or

    3.  Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

    a.  Blunt affect; or
    b.  Flat affect; or
    c.  Inappropriate affect;

or

    4.  Emotional withdrawal and/or isolation;

AND

    B.  Resulting in at least two of the following:

    1.  Marked restriction of activities of daily living; or

    2.  Marked difficulties in maintaining social functioning; or

    3.  Marked difficulties in maintaining concentration, persistence, or pace; or

    4.  Repeated episodes of decompensation, each of extended duration;

OR

    C.  Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years'

duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, 12.03. The ALJ concluded that, up to December 31, 2008, Plaintiff's delusional disorder met listing 12.03(C)(2). Citing Dr. Butler's testimony that the symptoms from Plaintiff's delusional disorder were no longer present in the record after 2008 and post-2008 treatment notes showing Plaintiff was being treated for PTSD, the ALJ concluded that Plaintiff no longer met the (C) criteria as of January 1, 2009. (T. 19, 20.)

Plaintiff asserts that evidence in the record establishes that he continues to meet listing 12.03(C)(2) after December 31, 2008. (Pl.'s Mem. at 27.) Plaintiff argues that the ALJ erred by failing to (1) take into account his lack of medical insurance in considering the dearth of medical documentation following December 2008 and (2) develop fully the record post-2008. (Pl.'s Mem. at 25-27, 28-30.) The Commissioner contends that (1) simply because a piece of post-2008 evidence was not cited in the ALJ's decision does not mean that the evidence was not considered; (2) the pieces of post-2008 evidence

relied on by Plaintiff are not medical evidence, do not reflect on Plaintiff's mental impairments, or were internally inconsistent; (3) the ALJ did not err by not contacting Coleman; and (4) the ALJ reasonably considered Plaintiff's lack of treatment post-2008. (Comm'r's Mem. at 16-26.).

There are five pieces of evidence in the record post-2008: a February 2009 medical opinion from Dr. Lewis (T. 619); notes indicating two[13] visits with Coleman between June and July 2009, whose content is illegible (T. 576-77); the December 2009 questionnaire completed by Coleman (T. 624-27); and Coleman's January 2011 letter indicating that Plaintiff "has been unable to receive regular therapy since the latter months of 2009, due to the loss of full health care insurance coverage," resulting in only crisis-based treatment (T. 628.) Collectively, the evidence shows a diagnosis of PTSD; accompanied by symptoms of "insomnia, startle effect, hypervigilance, recurring distressing thoughts, aversion to trauma images, estrangement and social isolation, [and] difficulty concentrating." (T. 619, 624, 628.)

The record contains no evidence indicating improvement, or deterioration, of Plaintiff's condition post 2008. The Commissioner is correct that Plaintiff's treatment history is "sparse" after 2008. (Comm'r's Mem. at 22.) "[A]n individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling." *Moraine v. Soc. Sec. Admin.*, No. 08-cv-5982 (JRT/RLE), 695 F. Supp.2d 925, 958 (D. Minn. 2010); *see also Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints.").

---

[13] A third appointment was scheduled in July, but Plaintiff did not appear. (T. 575.)

Nonetheless, "[s]ocial security hearings are non-adversarial, and an ALJ has a duty to fully develop the record, even when the claimant is represented by an attorney." *Johnson v. Astrue*, 627 F.3d 316, 319-20 (8th Cir. 2010) (quotation omitted). And "an ALJ must not draw any adverse inferences about a claimant's symptoms and their functional effects from a failure to pursue regular medical treatment without first considering whether the failure was caused by the claimant's inability to afford treatment or obtain access to free or low-cost medical services." *Routh v. Astrue*, 698 F. Supp.2d 1072, 1079 (E.D. Ark. 2010) (citing Soc. Sec. Rul. 96-7p, 1996 WL374186, at *7-8 (S.S.A. 1996)).

"It is for the ALJ in the first instance to determine [the claimant's] motivation for failing to follow prescribed treatment or seek medical attention." *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989). At the hearing, the ALJ asked Plaintiff about Coleman's letter regarding Plaintiff's lack of insurance. (T. 88.) Plaintiff testified that Coleman was correct, he had been told he was "shut out" of treatment, (T. 82, 89), and, when he went to hospital, he was not able to get treatment, (T. 89). The ALJ noted this testimony in his decision (T. 22), yet then relied on the absence of treatment to conclude that Plaintiff's undisputed severe impairments no longer not meet or equal a listing. Here, Plaintiff testified that he had *both* sought treatment and was denied treatment. *Cf. Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003) (ALJ did not err in relying on claimant's failure to seek mental health treatment where "there is no evidence either [claimant] or her mother attempted to obtain treatment and were denied such treatment because of insufficient funds or insurance"). Similarly, Coleman's notes indicate that Plaintiff is living on $203.00 per month of general assistance. (T. 590, 597.) *See Johnson*, 866 F.2d

at 275 ("[L]ack of financial resources may in some cases justify the failure to seek medical attention." (quotation omitted)); *see also Tang v. Apfel*, 205 F.3d 1084, 1086 (8th Cir. 2000) (claimant's "inability to afford medication cannot be used as a basis for denial of benefits").

In a December 4, 2008 treatment note, Coleman wrote that Plaintiff still "talked of being consumed with the harassment issues, though more threatening . . . in his tone." (T. 578.) While meeting with Benton the following week, Plaintiff told her about the harassment and, during the session, exclaimed that "they were after him" when he saw UPS and FedEx trucks coming down a nearby alley. (T. 30.) This Court is hard-pressed to conclude that, roughly two to three weeks later, Plaintiff's delusional disorder was resolved. Given Plaintiff's financial and insurance situation, this Court is even harder-pressed to conclude that the absence of medical records post-2008 constitutes substantial evidence to support the ALJ's decision that Plaintiff's impairments no longer met or medically equaled a listing as of January 1, 2009.

At the 2011 hearing, Plaintiff continued to exhibit the same delusions of harassment and persecution, (T. 82-84, 86, 116), documented by Drs. Wamuo and Karayusuf five years earlier, (T. 461-62, 474-76), whose opinions the ALJ relied on in concluding that Plaintiff's delusional disorder *did meet* listing 12.03(C)(2) through 2008, (T. 19). If the medical records presented do not provide sufficient evidence to determine disability, the ALJ is required to order medical examinations and tests. *Johnson*, 627 F.3d at 320.

Furthermore, when concluding that Plaintiff's delusional disorder *met* listing 12.03(C)(2) for the closed period, the ALJ noted that "Dr. Butler's opinion is also consistent with the *Medical Source Statement prepared in December 2008 by [Dr. Lewis]*, a treating source, who opined that, *as a result of '[PTSD] by history*,' [Plaintiff] would not be able to perform employment *in the foreseeable future*." (T. 19 (emphasis added); *see also* T. 569.) Two months later, *in February 2009*, Dr. Lewis's diagnosis remained the same. (T. 619.)

Lastly, while Coleman's June 2009 treatment note is quite short, the July 2009 treatment note is almost a page long. (*Compare* T. 577 *with* T. 576.) Coleman is a licensed psychologist and acceptable medical source. *See* 20 CFR §§ 404.1513(a)(2), 416.913(a)(2); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1, 12.03. These illegible treatment notes may very well shed light on Plaintiff's condition post-2008. "An ALJ should recontact a treating or consulting physician if a critical issue is underdeveloped." *Johnson*, 627 F.3d at 320.

Here, the ALJ confirmed Plaintiff did not have medical treatment available to him, but then relied on that lack of treatment to conclude that Plaintiff's still-present severe impairments no longer met or equaled a listing. This Court cannot conclude that the ALJ's determination that Plaintiff's severe impairments did not meet or equal a listing beginning on January 1, 2009, is supported by substantial evidence.

"[A] a remand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision." *Scott ex rel. Scott v. Astrue*, 529 F.3d

818, 822 (8th Cir. 2008). Therefore, this Court recommends that this matter be remanded for further development of the record on the issue of medical equivalency.

Because this Court recommends that this matter be remanded for further development of the record at step three of the disability analysis, the Court does not reach Plaintiff's assertions of error with respect to the ALJ's determination of Plaintiff's mental residual-functional capacity at step four (the (1) offer of proof concerning Dr. Butler; (2) weight accorded to the opinions of treating sources and agency evaluators, including without limitation the 2009 questionnaire completed by Coleman; and (3) offer of proof concerning Plaintiff's credibility) or the hypothetical posed by the ALJ at step five.

[Continued on next page.]

## IV. Recommendation

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket No. 8) be **GRANTED** and this matter be **REMANDED** for further proceedings and Defendant's Motion for Summary Judgment (Docket No. 13) be **DENIED**.

Dated: February ___12th___, 2013        _____*s/ Tony N. Leung*_____
                                              Tony N. Leung
                                              United States Magistrate Judge
                                              for the District of Minnesota

                                              *Campbell v. Astrue*
                                              File No. 12-cv-336 (DWF/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **February 27, 2013**.